UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | |
|---|---|
| SHIRLEY HILDRETH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No.: 7:16-cv-00415-JHE |
| ) | |
| COMMISSIONER OF SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION**[1]

Plaintiff Shirley Hildreth ("Hildreth") seeks review, pursuant to 42 U.S.C. § 405(g), § 205(g) of the Social Security Act, of a final decision of the Commissioner of the Social Security Administration ("Commissioner"), denying her application for a period of disability, disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). Hildreth timely pursued and exhausted her administrative remedies. This case is therefore ripe for review under 42 U.S.C. § 405(g). The undersigned has carefully considered the record and, for the reasons stated below, the Commissioner's decision is **REVERSED** and this action is **REMANDED** for further proceedings.

### I. Factual and Procedural History

Hildreth filed her application for a period of disability, DIB, and SSI on March 13, 2012, alleging an initial onset date of April 26, 2011. (Tr. 279, 284). Hildreth was a forty-three-year-old female on December 31, 2013, her date last insured. ("DLI"). (Tr. 76, 103). Hildreth has a

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties in this case have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment. (Doc. 13).

GED and past relevant work as a certified nursing assistant. (Tr. 103). The Commissioner initially denied Hildreth's application, (Tr. 196), and Hildreth requested a hearing before an ALJ where she appeared on September 5, 2013. (Tr. 202 ,99). After a hearing, the ALJ denied Hildreth's claim on June 27, 2014. (Tr. 73). Hildreth sought review by the Appeals Council, but it declined her request on January 13, 2016. (Tr. 1). On that date, the ALJ's decision became the final decision of the Commissioner. On March 11, 2016, Hildreth initiated this action. (*See* doc. 1).

## II. Standard of Review[2]

The court's review of the Commissioner's decision is narrowly circumscribed. The function of this Court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards were applied. *Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). This court must "scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* It is "more than a scintilla, but less than a preponderance." *Id.*

This Court must uphold factual findings that are supported by substantial evidence. However, it reviews the ALJ's legal conclusions *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. *Davis v. Shalala*,

---

[2] In general, the legal standards applied are the same whether a claimant seeks DIB or SSI. However, separate, parallel statutes and regulations exist for DIB and SSI claims. Therefore, citations in this opinion should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations for statutes or regulations found in quoted court decisions.

2

985 F.2d 528, 531 (11th Cir. 1993). If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining the proper legal analysis has been conducted, it must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

### III. Statutory and Regulatory Framework

To qualify for disability benefits and establish her entitlement for a period of disability, a claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder.[3] The Regulations define "disabled" as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve (12) months." 20 C.F.R. § 404.1505(a). To establish entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1508.

The Regulations provide a five-step process for determining whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(i-v). The Commissioner must determine in sequence:

(1) whether the claimant is currently employed;
(2) whether the claimant has a severe impairment;
(3) whether the claimant's impairment meets or equals an impairment listed by the [Commissioner];
(4) whether the claimant can perform his or her past work; and
(5) whether the claimant is capable of performing any work in the national economy.

---

[3] The "Regulations" promulgated under the Social Security Act are listed in 20 C.F.R. Parts 400 to 499, revised as of April 1, 2007.

*Pope v. Shalala*, 998 F.2d 473, 477 (7th Cir. 1993) (citing to the formerly applicable C.F.R. section), *overruled on other grounds by Johnson v. Apfel*, 189 F.3d 561, 562-63 (7th Cir. 1999); *accord McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986). "Once the claimant has satisfied steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have a listed impairment but cannot perform her work, the burden shifts to the [Commissioner] to show that the claimant can perform some other job." *Pope*, 998 F.2d at 477; *accord Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995). The Commissioner must further show such work exists in the national economy in significant numbers. *Id.*

### IV. Findings of the Administrative Law Judge

After consideration of the entire record and application of the sequential evaluation process, the ALJ made the following findings:

At Step One, the ALJ found Hildreth met the insured status requirements of the Social Security Act through December 31, 2013, and that Hildreth had not engaged in substantial gainful activity since April 26, 2011, the alleged onset date of her disability. (Tr. 78). At Step Two, the ALJ found Hildreth has the following severe impairments: morbid obesity; status post open reduction internal fixation, right hip, due to fracture; status post arthroscopic surgery, right knee; osteoarthritis, upper extremities; history of gout; and major depressive disorder. (*Id.*). The ALJ noted that Hildreth also suffers from asthma with controlled medications, migraines, hypertension, history of anemia, one event of hypoglycemia, and generalized anxiety; however, the ALJ found these impairments only caused a slight limitation in Hildreth's capacity for work activity. (*Id.*) At Step Three, the ALJ found Hildreth does not have an impairment or

4

combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 80).

Before proceeding to Step Four, the ALJ determined Hildreth's residual functioning capacity ("RFC"), which is the most a claimant can do despite her impairments. *See* 20 C.F.R. § 404.1545(a)(1). The ALJ determined Hildreth has the RFC

> to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except the claimant can sit at least three hours without interruption and a total of at least five hours over the course of an eight-hour workday. The claimant can stand and/or walk at least one hour without interruption and a total of at least three hours over the course of an eight-hour workday. The claimant can rarely up to but no more than one hour over the course of an eight-hour workday, use her right lower extremity for the operation of foot controls. The claimant can occasionally use her lower left extremity for the operation of foot controls. The claimant can frequently use her upper extremities for reaching in all directions, pushing, pulling, handling, and fingering. The claimant cannot stand or walk on uneven terrain. The claimant cannot climb ladders, ropes, poles, or scaffolds. The claimant can occasionally climb ramps and stairs. The claimant can occasionally balance, stoop, and crouch. She cannot kneel or crawl. She can occasionally work in wetness, humidity, and extreme temperatures. The claimant can occasionally work in dusts, gases, odors, and fumes. The claimant cannot work in poorly ventilated areas. The claimant cannot work at unprotected heights. The claimant cannot work with operating hazardous machinery. The claimant can occasionally work while exposed to vibration. The claimant cannot operate motorized vehicles. The claimant cannot perform work activity that requires her response to rapid and/or frequent multiple demands.

(Tr. 82).

At Step Four, the ALJ determined Hildreth is unable to perform any past relevant work. (Tr. 89). At Step Five, the ALJ determined, based on Hildreth's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy Hildreth could perform. (Tr. 89). Therefore, the ALJ determined Hildreth has not been under a disability and denied Hildreth's claim. (Tr. 92).

5

## V. Analysis

Hildreth contends the ALJ erred by: (1) giving improper weight to the opinion of consultative examiner Dr. Walid W. Freij; (2) failing to address rheumatoid arthritis as a severe impairment; and (3) failing to fully and fairly develop the record. Hildreth also argues that the Appeals Council did not properly evaluate evidence she submitted to it after the ALJ's decision. None of the three arguments Hildreth makes as to errors by the ALJ have merit, but the errors of the Appeals Counsel require reversal.

### A. The ALJ properly evaluated the opinion of Dr. Freij.

Hildreth argues the ALJ erred in only giving "some weight" instead of "great weight" to the opinion of consultative examiner Dr. Walid W. Freij. (Doc. 10 at 10). Specifically, Hildreth argues that the ALJ's decision is not supported by substantial evidence because he found Dr. Freij's opinion "consistent with the case at hand," yet gave the opinion only "some weight" and found Hildreth had different limitations than those Dr. Freij suggested. (Doc. 10 at 9-10).

On October 10, 2013, Dr. Walid W. Freij performed an examination on Hildreth at the request of the Administration. (Tr. 86, 703). Dr. Freij noted Hildreth had been diagnosed with osteoarthritis and gout. (Tr. 703). At the examination, Hildreth described having swelling in the fingers and hands, and claimed that daily living activities, household chores, carrying and lifting worsened her symptoms. (Tr. 703). Dr. Freij found no swelling, redness, heat, or limitation in the range of motion in any joint and no limitation in flexion or extension of the spine; however, he found tenderness over the right hip, limitation to 20 degrees in straight leg raising on the right side, and limitation in the flexion of the right knee to about 100 degrees. (Tr. 704). Dr. Freij diagnosed Hildreth with osteoarthritis affecting the fingers, toes, elbows, ankles, and wrists, right knee arthritis status post arthroscopic surgery, a history of gout, and lower back pain likely

related to arthritis (although he noted there was no work-up for Hildreth's back symptoms). (Tr. 705). Dr. Freij opined:

> Based on the above history and physical examination, patient would not be able to do work related activities that would require her to stand or walk for any extended period of time. She's not able to carry or lift because of the same problems. She has extreme difficulty in bending [and] stooping, and she is] not able to kneel. She's able to hear [speech]. Traveling can be done in moderation.

(Tr. 705). In addition, Dr. Freij completed a medical source statement in which he stated Hildreth could sit for three hours at a time and five hours in an eight hour work day; could stand and walk for 30-45 minutes at a time and two hours each in an eight-hour work day; could reach, push, and pull occasionally; could handle, finger, and feel frequently; could never operate foot controls with her right foot; could occasionally operate foot controls with her left foot; could occasionally balance and climb stairs and ramps; could never climb ladders or scaffolds; and could never stoop, kneel, crouch, or crawl. (Tr. 707-709).

The ALJ stated he gave Dr. Freij's opinion "some weight, as it is consistent with the case at hand." (Tr. 88). However, the limitations in the ALJ's RFC were somewhat less restrictive than those offered by Dr. Freij. The ALJ and Dr. Freij agreed that Hildreth could sit at least three hours without interruption and for a total of five hours in an eight-hour work day; could occasionally use her left foot to operate foot controls; could not climb ladders or scaffolds, could occasionally climb ramps or stairs, and could not kneel or crawl. (*Compare* tr. 82 *with* tr. 707-709). The ALJ determined—contrary to Dr. Freij's medical source statement—that Hildreth could stand or walk at least one hour without interruption for a total of three hours in an eight-hour work day; could frequently reach, push, pull, handle, and finger; could rarely use her right

7

foot to operate foot controls for no more than one hour during an eight-hour work day; and could occasionally balance, stoop, and crouch.   (Tr. 82).

The thrust of Hildreth's argument is that because the ALJ found Dr. Freij's opinion "consistent with the case at hand," he should therefore have deferred to Dr. Freij's determination of Hildreth's RFC.  First, the ALJ was not required to give any particular weight to Dr. Freij's opinion, as he was a one-time consultative examiner.  *Denomme v. Comm'r, Soc. Sec. Admin.*, 518 F. App'x 875, 877 (11th Cir. 2013) (citing *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir.1987)).  Second, this inverts the roles the two occupy:

> According to 20 C.F.R. § 404.1527(d), the determination of whether an individual is disabled is reserved to the Commissioner, and no special significance will be given to an opinion on issues reserved to the Commissioner. Section (d)(2) provides that although the Commissioner will consider opinions from medical sources **on issues such as the RFC** and the application of vocational factors, the final responsibility for deciding those issues is reserved to the Commissioner.

*Pate v. Comm'r, Soc. Sec. Admin.*, 678 F. App'x 833, 834 (11th Cir. 2017) (emphasis added).  In other words, "the task of determining a claimant's residual functional capacity and ability to work is within the province of the ALJ, not of doctors." *Robinson v. Astrue*, 365 F. App'x 993, 999 (11th Cir. 2010).  The ALJ was not required to give Dr. Freij's opinion on Hildreth's limitations great or controlling weight in determining Hildreth's RFC because the determination of an RFC is reserved for the commissioner.  SSR 96-5p at *1.  The ALJ's comment that Dr. Freij's opinion was, as a general matter, "consistent with the case at hand" does not also lead to the conclusion the ALJ should have accepted Dr. Freij's assessment of Hildreth's RFC.

The ALJ explained the consideration given to Dr. Freij's opinion when he stated he gave the opinion "some weight" for being "consistent with the case at hand."  (Tr.  88).  With the exception of his opinions regarding Hildreth's limitations, Dr. Freij's examination is consistent

8

with the opinions of two other consultative examiners, Dr. Thomas J. Sabourin, (tr. 485-89) and Dr. Richard S. Abney, (tr. 557-59), to whom the ALJ gave significant weight. (Tr. 88). Dr. Freij's examination was also consistent with the other objective medical evidence showing no swelling, redness, heat, or limitation in the range of motion in any joint, (tr. 583, 609, 641, 642 649 738), discomfort and reduced range of motion in her right hip (tr. 742), lower back pain (tr. 427, 434, 559, 594, 597, 745), and no restrictions or limitations in her spine, (tr. 453, 738). Thus, substantial evidence supports the weight the ALJ assigned to Dr. Freij's opinion.

**B. The ALJ did not err in failing to list rheumatoid arthritis as a severe impairment.**

Hildreth contends that the ALJ should have included rheumatoid arthritis as a severe impairment during step two of the sequential evaluation process. (Doc. 10 at 8).

In order for an ALJ to determine a claimant has a severe impairment, a claimant must have an impairment or combination of impairments which limits the claimant's ability to do basic work activities for at least twelve consecutive months. 20 C.F.R. §§ 404.1520(c), 404.1509. The claimant bears the burden of proving that a severe impairment exists. 20 C.F.R. § 416.912. The ALJ is not required to identify all severe impairments at step two, but "the ALJ is required to demonstrate that it has considered all of the claimant's impairments, whether severe or not, in combination" at step three. *Heatly v. Comm'r Soc. Sec.*, 382 F. App'x 823, 824-25 (11th Cir. 2010). "[R]emands are required when an ALJ fails to consider properly a claimant's condition despite evidence in the record of the diagnosis." *Vega v. Comm'r of Soc. Sec.*, 265 F.3d 1214, 1219 (11th Cir. 2001) (citation omitted).

Hildreth points to her "numerous diagnoses of rheumatoid arthritis." (Doc. 10 at 6). However, Hildreth's symptoms—joint pain, swelling, and decreased motion—are attributed at various points in the record to both rheumatoid arthritis and osteoarthritis, (*see, e.g.,* tr. 634-37

9

(noting both osteoarthritis and rheumatoid arthritis as chronic problems; 640-43 (same)); to only one of the two conditions, (*see, e.g.,* tr. 592-94 (noting joint pain and joint swelling in Hildreth's hands attributable to "mild OA"); 650-52 (noting diagnosis for osteoarthritis on emergency room visit for joint pain); 703 (observing previous diagnosis of osteoarthritis)) , or simply to "arthritis" with no underlying etiology, (*see* tr. 608). Hildreth does not contend her rheumatoid arthritis produces any symptoms not potentially also attributable to her osteoarthritis, which the ALJ found to be a severe impairment. (Tr. 78).

Hildreth also elides the distinction between identifying a severe impairment at step two and addressing limitations imposed by an impairment at step three. Had the ALJ failed to find a severe impairment at all at step two, Hildreth's argument would make more sense. However, an ALJ's failure to identify *every* severe impairment at step two is harmless error as long as the ALJ identifies *some* severe impairment (and thus continues with the sequential evaluation), assuming that the ALJ accounts for the impairment's symptoms at step three. *Heatly,* 382 F. App'x at 824-25. The ALJ did so here, considering the symptoms and effects of rheumatoid arthritis at step three despite not explicitly noting rheumatoid arthritis as a severe impairment. Specifically, he noted Hildreth's visits to Anderson Regional Medical Center and the Anderson Arthritis and Rheumatology Center (both of which involved complaints and diagnoses of rheumatoid arthritis, (*see* tr. 628, 634-37) and that Hildreth complained of or received treatment for musculoskeletal pain, knee pain, hand pain, wrist pain, calf pain, joint pain, shoulder pain, and decreased motion in her wrists and knees during those visits. (Tr. 85). The ALJ also gave "some weight" to the opinion of Dr. Freij, which assessed substantially the same symptoms—attributed to osteoarthritis—and contained Dr. Freij's opinion of Hildreth's limitations (although, as discussed above, the ALJ did not wholly subscribe to that opinion). (Tr. 86, 88). Hildreth does not

10

contend the RFC failed to account for the symptoms produced by her rheumatoid arthritis, nor does Hildreth identify any additional limitations that should have been imposed. Therefore, whatever error the ALJ committed in omitting rheumatoid arthritis as a severe impairment was harmless.

### C. The ALJ was not required to develop the record further.

Hildreth contends that the ALJ failed to fully and fairly develop the record in two ways: (1) the ALJ should have issued a subpoena to obtain additional medical records; and (2) the ALJ's use and solicitation of vocational expert testimony was improper.

The ALJ "has a basic obligation to develop a full and fair record." *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997). "[T]here must be a showing of prejudice before it is found that . . . the case must be remanded to the Secretary for further development of the record." *Id.* at 1423. "The court should be guided by whether the record reveals evidentiary gaps which result in unfairness or clear prejudice." *Id.* (citing *Brown v. Shalala*, 44 F.3d 931, 934-35 (11th Cir. 1995)) (internal quotation marks omitted).

#### 1. The ALJ did not err in refusing to issue a subpoena.

At the hearing, Hildreth's counsel noted there were outstanding records from the West Alabama Mental Health Center ("WAMHC"), and the ALJ allowed Hildreth two weeks to submit those records. (Tr. 120, 144). However, on April 9, 2014, Hildreth's counsel sent a letter to the ALJ to inform him that he could not submit the records because "the center has not complied with [his] requests" for them. (Tr. 386). Hildreth's counsel stated "[t]he treatment records are vital to this claim" and requested the ALJ issue a subpoena for them. (*Id.*). The ALJ declined to do so, concluding "[n]either the representative nor the claimant provided any proffer that would suggest that the records would materially affect the undersigned's decision." (Tr. 79).

11

Hildreth contends the ALJ's failure to issue the subpoena violated his duty to fairly develop the record. (Doc. 10 at 10-11).

An ALJ may issue subpoenas for the production of records at the request of a party when it is "reasonably necessary for the full presentation of the case." 20 C.F.R. § 404.950(d)(2). The party's written request for a subpoena must "state the important facts that the . . . document is expected to prove[] and indicate why these facts could not be proven without issuing a subpoena." *Id.* Here, Hildreth did not comply with a regulatory prerequisite intended to show that an evidentiary gap exists, instead simply stating that the records were "vital to this claim" without identifying any important facts the records would prove or why the facts could not be proven without the subpoena. (Tr. 386). In other words, there was nothing to suggest that the records sought by Hildreth would be meaningfully different from the evidence before the ALJ, and Hildreth's own failure to supply the "reasonable necessity" for subpoenaing the records was not unfair to her. Therefore, the ALJ did not err by denying Hildreth's request for a subpoena.

**2. The ALJ did not err in obtaining testimony from additional vocational experts.**

At the hearing, the ALJ posed several hypotheticals to the vocational expert ("VE"), and challenged the VE's conclusions as to whether particular jobs satisfied the hypotheticals. (Tr. 131-41). Following the hearing, after concluding the VE's "responses did not appear consistent with the undersigned's interactions with other vocational experts," the ALJ sent a set of interrogatories to an additional VE, Leigh Clemmons. (Tr. 90, 388-92). Hildreth provided the ALJ with two interrogatories and requested the ALJ submit them to Clemmons, (tr. 385); the ALJ included one, but declined to include the other. Hildreth argues the ALJ erred by challenging the VE's suggestions, suggesting jobs for the VE to find, and failing to submit her interrogatory to Clemmons. (Doc. 10 at 14).

12

Hildreth offers no authority indicating any of these actions is reversible error. As part of his "basic obligation to develop a full and fair record," *Graham*, 129 F.3d at 1422, the ALJ is within his authority to obtain additional testimony from another VE as long as it does not prejudice the claimant. Notably, Hildreth does not argue she was prejudiced by any of the actions she claims were improper. At the hearing, the ALJ asked the VE to consider whether the limitations he imposed in his hypothetical were consistent with the jobs proposed by the VE. (Tr. 136-41). If anything, this was to Hildreth's benefit; the ALJ questioned the VE about jobs that he felt were more demanding than the hypothetical permitted. (*See, e.g.,* tr. 132 ("just in my humble opinion, I believe that type of work would require more aggressive physical capacity than the hypothetical allows. It may fit within the DOT, but I don't — I just don't envision that person performing that work."); 137 ("Would an election clerk not face during the election periods rapid and/or frequent multiple demands [foreclosed by the hypothetical]?"); 139 ("I could almost see someone in that position even though they spend most of the job sitting, I could see a scenario where they would have to get up and respond quickly")).

The ALJ also stated he found the first VE's responses "did not appear consistent with the undersigned's interaction with other vocational experts." (Tr. 90). While Hildreth argues this raises the possibility the ALJ improperly discussed the case with outside individuals, (doc. 10 at 15), no evidence supports this improbable assertion. Hildreth also takes issue with the contradictions between the testimony of the VE at the hearing and the Clemmons's interrogatory responses, (*id.*), but the ALJ has the authority to resolve contradictory evidence, including contradictory vocational expert testimony. *See Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 541 (7th Cir. 1992).

Hildreth also contends that the ALJ should have submitted her second interrogatory to Clemmons. (Doc. 10 at 15). In her second interrogatory, Hildreth requested the VE consider whether the jobs provided would change if she experienced "pain and side effects from medications that prevent her from maintaining her attention, concentration, and pace for periods of at least two hours . . . ." (Tr. 385). The ALJ had already considered that Hildreth's pain and medications would cause her to be unable to respond to rapid or frequent multiple demands, (tr. 91, 391), and there is no evidence to support the additional limitation Hildreth offers. The ALJ was not required to include unsupported allegations in hypothetical questions. *Crawford v. Comm. of Soc. Sec.*, 363 F.3d 1155, 1161 (11th Cir. 2004). Therefore, the ALJ did not err in refusing to submit the second interrogatory to the VE.

Finally, Hildreth takes issue with the fact that Clemmons's qualifications were not included in the responses to the interrogatories. (Doc. 10 at 15). The ALJ had Clemmons's qualifications on file and requested she correct them if necessary. (Tr. 388). Hildreth raised no objection to Clemmons's qualifications when given the opportunity to review the interrogatories that would be sent to Clemmons, nor did she request Clemmons's qualifications. (Tr. 385). Hildreth also did not raise any issues with Clemmons's qualifications when asking if the ALJ had sent Hildreth's proposed interrogatories to the Clemmons. (Tr. 393). Hildreth declined to raise this argument as part of her appeal to the Appeals Council. (Tr. 394-397). Whatever objections she may have had to Clemmons's qualifications, Hildreth has waived them. *See Biles v. Colvin*, 2016 WL 3876443, at *10 (N.D. Fla. June 28, 2016) (citing *King v. Astrue*, 2011 U.S. Dist. LEXIS 49707, at *36-38 (N.D. Cal. May 10, 2011)) (holding plaintiff waived right to challenge the VE's qualifications as a result of failing to object).

None of Hildreth's challenge to the ALJ's handling of vocational expert testimony have merit, and none provides a basis to reverse or remand.

**D. The Appeals Council erred in evaluating new evidence during the appeals process.**

Hildreth submitted the records the ALJ declined to subpoena to the Appeals Counsel, but the Appeals Council declined to enter the evidence into the record, stating it was "about a later time." (Tr. 2, 5, 40-52). Hildreth argues that the Appeals Council erred in evaluating this evidence. (Doc. 10 at 16).

The Appeals Council must review a case if the Council receives additional evidence that is new, material, and chronologically relevant, and "there is a reasonable probability that the additional evidence would change the outcome of the decision." 20 C.F.R. § 404.970(a)(5); *Ingram v. Comm'r of Soc. Sec.*, 496 F.3d 1253, 1261 (11th Cir. 2007). "[W]hether evidence meets the new, material, and chronologically relevant standard is a question of law subject to . . . *de novo* review," and an erroneous failure to consider such evidence warrants remand. *Washington v. Soc. Sec. Admin., Com'r*, 806 F.3d 1317, 1321 (11th Cir. 2015).

Hildreth argues the Appeals Council improperly reviewed records from WAMHC dated November 25, 2013, through May 15, 2014 because it did not address them in its notice and the records are new, material, and chronologically relevant. (Doc. 10 at 16). The Appeals Council rejected the new submission entirely, simply stating the records were "from a later time." (Tr. 2). While some of the records postdated the ALJ's June 27, 2014 decision and were thus arguably not chronologically relevant, the Appeals Council did not mention the records that predated the ALJ's decision at all; in fact, it misstated the dates of the WAMHC records entirely. It characterized the two sets of records from WAMHC as "dated September 30, 2014 to January

15

27, 2015," (tr. 2), (when in reality this set spans September 30, 2014 to March 6, 2015, (*see* tr. 40-45)) and "dated July 30, 2014 to December 13, 2014," (tr. 2), (when this set contains records from November 25, 2013 to September 30, 2014, (*see* tr. 46-52)). [4]

The pre-decision records consist of four pages comprising three visits to WAMHC. At the first of these visits, a family counseling appointment dated November 25, 2013, Hildreth reported aches and pains associated with gout. (Tr. 52). Hildreth was medication complaint and oriented to person, place, time, and situation; but sleeping poorly and restless, with a depressed mood and a labile affect. (*Id*). Intervention was described as "attentive listening; clarification; discussed need for psychiatric appointment." (*Id.*). Hildreth scheduled her next appointment. (*Id.*). The next record concerns an individual counseling visit on February 13, 2014, at which Hildreth was oriented to person, depressed, irritable, and agitated, with a labile affect. (Tr. 51). Hildreth reported joint pain and increased anxiety and depression. (*Id.*). Hildreth and the provider "discussed the need for a psychiatric consult to determine the need for medication." (*Id.*). At her next visit, an individual counseling session dated May 15, 2014, Hildreth had a normal affect with a depressed mood, was calm, and was oriented as to person, place, time, and situation; she reported arthritis pain, not doing as many activities, and her mood down on most days. (Tr. 50). Hildreth was encouraged to think positively. (*Id.*). The final page, also dated May 15, 2014, concerns only Medicaid reimbursement. (Tr. 49).

---

[4] The Commissioner notes the Appeals Council "considered the additional evidence that was dated before the date of the ALJ's decision . . . but found that the information did not provide a basis for changing the ALJ's decision[.]" (Doc. 11 at 20-21). Since the Appeals Council incorrectly stated the earliest WAMHC records began after the date of the ALJ's decision, the Commissioner's argument does not support the conclusion the Appeals Council considered the WAMHC records at all.

These records are material. While the ALJ determined Hildreth's depression was a severe impairment and accounted for it in her RFC, he also found Hildreth's visit to Dr. Drew Huffman in January 2014 (at which Hildreth was negative for anxiety and depression) showed that the Cymbalta she had been prescribed for depression was "successful in addressing her symptoms." (Tr. 88). Therefore, he found Hildreth's depression "severe, but not disabling." (*Id.*). However, the visits to WAMHC noted above, each of which involve Hildreth presenting with depression, postdate the visit at which the ALJ found Hildreth's depression effectively treated. Additionally, at two of these visits, the provider discussed the need for a psychiatric consultation to determine whether additional medication was required. Because the records directly contradict the ALJ's conclusion Hildreth's depression was asymptomatic with treatment (and thus not disabling), there is a reasonable possibility that considering them would change the administrative result. Remand is appropriate to consider the new evidence.

Hildreth also argues the Appeals Council rejected WAMHC records dated July 30, 2014, through January 27, 2015, solely because they were dated after the ALJ's decision. (Doc. 10 at 16). While these records are potentially not chronologically relevant because they postdate the ALJ's decision, that is not necessarily sufficient to discount them. *See Washington*, 806 F.3d at 1322 (holding new evidence dated after the ALJ's decision chronologically relevant when it assessed the conditions that existed prior to the decision and there was no evidence of deterioration). On remand, the ALJ should assess whether the records dated after June 27, 2014 are chronologically relevant.

## VI. Conclusion

For the reasons set forth herein, and upon careful consideration of the administrative record and memoranda of the parties, the decision of the Commissioner of Social Security

17

denying Hildreth's claim for a period of disability, SSI, and DIB is **REVERSED** and the action is **REMANDED** for the ALJ to consider the West Alabama Mental Health Center records.

DONE this 27th day of September, 2017.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE